# Illinois Official Reports

## Appellate Court

---

### *Villaverde v. IP Acquisition VIII, LLC*, 2015 IL App (1st) 143187

---

| | |
|---|---|
| Appellate Court Caption | MARCIAL VILLAVERDE, Plaintiff-Appellant and Cross-Appellee, v. IP ACQUISITION VIII, LLC, BARBARA M. SPAIN 2004 REVOCABLE TRUST, and PATRICK SPAIN, Defendants-Appellees and Cross-Appellants. |
| District & No. | First District, Third Division<br>Docket No. 1-14-3187 |
| Filed | August 12, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-43070; the Hon. Neil Cohen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kristen E. Prinz, Jessica Fayerman, and Amit Bindra, all of Prinz Law Firm, P.C., of Chicago, for appellant.<br><br>Paul W. Carrol and Jordan M. Hanson, both of Gould & Ratner, LLP, of Chicago, for appellees. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Lavin and Mason concurred in the judgment and opinion.

**OPINION**

¶ 1      Defendant, Marcial Villaverde won a $166,000 judgment for unpaid wages against his former employer, S1 Audio, LLC, owned by Christopher Gantz. During the wage litigation, creditors of S1 Audio, defendants IP Acquisition VIII, LLC, Barbara M. Spain 2004 Revocable Trust (Spain Trust or Trust) and Patrick Spain (collectively, defendants), conducted a foreclosure sale and acquired S1 Audio's most valuable asset–its intellectual property, preventing Villaverde from being able to collect his judgment.

¶ 2      Villaverde filed suit alleging (1) successor liability; (2) civil conspiracy; and (3) violation of the Illinois Uniform Fraudulent Transfer Act (UFTA) (740 ILCS 160/1 *et seq.* (West 2010)). Defendants moved for summary judgment, and sanctions under Illinois Supreme Court Rule 137 (eff. July 1, 2013) for filing the suit. The trial court granted summary judgment in favor of defendants, finding that IP Acquisition was not a successor corporation to S1 Audio and that no transfer of assets took place between S1 Audio and IP Acquisition in violation of the UFTA. The court also denied the motion for sanctions.

¶ 3      Villaverde seeks reversal of the summary judgment order, claiming IP Acquisition conducted the foreclosure sale solely to avoid paying Villaverde's judgment. Villaverde contends a genuine issue of material fact exists on whether IP Acquisition constitutes a successor to S1 Audio. He further contends ample evidence exists to support his civil conspiracy claim. Defendants cross-appealed contending the trial court should have granted their motion for sanctions, arguing the complaint contains false statements and meritless legal claims.

¶ 4      We affirm the trial court's grant of summary judgment on the basis that no exception to the doctrine of corporate successor nonliability applies under the facts of this case. Furthermore, the trial court acted well within its discretion in denying defendants' motion for sanctions against Villaverde.

¶ 5                          BACKGROUND
¶ 6      Christopher Gantz owned S1 Audio between 2007 and December 2011 and employed five individuals. Gantz paid $750,000 to acquire the rights to NxSet's intellectual property for a headphone that sits on a person's shoulders. S1 Audio developed and attempted to sell, license, and market NxSet.

¶ 7      Villaverde worked for S1 Audio from November 2008 to July 16, 2010. On September 24, 2010, Villaverde filed suit against Gantz and S1 Audio for failing to pay him wages. On February 19, 2013, Villaverde obtained a judgment in the wage litigation against Gantz and S1 Audio in the amount of $166,000.

¶ 8      On December 4, 2012, some 10 weeks before the trial court entered judgment in the wage litigation, Villaverde filed this suit against defendants and Gantz to recover the judgment from his unpaid wages. In his first amended complaint, Villaverde alleged: (1) a violation of the UFTA (740 ILCS 160/1 *et seq.* (West 2010)) based on the transfer of the intellectual property from the Trust to IP Acquisition, (2) successor liability (claiming IP Acquisition is a merger or

consolidation of S1 Audio and that defendants foreclosed the intellectual property to defraud Villaverde), and (3) civil conspiracy.

¶ 9                                Gantz-Spain Relationship

¶ 10       Gantz had been friends with Patrick Spain since 1979. Between 2007 and 2010, Spain, either individually or through the Spain Trust, provided eight different loans to Gantz and S1 Audio. In 2009, the Spain Trust loaned S1 Audio $100,000 in exchange for a security interest in the company's intellectual property. S1 Audio did not make any loan payments to Spain or the Spain Trust. On November 4, 2011, the Spain Trust provided the only notice of default, informing S1 Audio it had until November 11 to satisfy the $267,276.74 owed the Trust. S1 Audio did not cure the default and the Trust exercised its right as the primary secured creditor to foreclose its security interest.

¶ 11       In December 2011, the Spain Trust advertised in the Chicago Daily Law Bulletin the foreclosure sale of the intellectual property. On December 7, 2011, the date of the public sale, no outside bids were made for the intellectual property. The sale was extended and, on December 19, 2011, the Trust sold its security interest in S1 Audio to IP Acquisition of which Spain served as the managing member. The next day, IP Acquisition acquired the intellectual property of S1 Audio by making a credit bid–offering the amount of the debt S1 Audio owed.

¶ 12       Spain admitted IP Acquisition has only one asset–the S1 Audio intellectual property. Unlike S1 Audio, which developed and attempted to sell, license, and market the headphones, IP Acquisition's business involved only selling or licensing the intellectual property. IP Acquisition attempted to sell the intellectual property at a targeted online auction but received only one bid of $5,000. IP Acquisition claims that before the auction, they offered Villaverde the right to share in the proceeds of any sale, but he refused.

¶ 13       On October 1, 2012, IP Acquisition hired Gantz as an independent sales representative. The agreement, dated June 1, 2012, provides Gantz with 20% of any money that IP Acquisition receives for the intellectual property. Gantz continued to try to license or market the intellectual property by working with prospective investors in America, Korea, and Japan. Gantz communicated with the potential investors; Spain did not participate in the conversations.

¶ 14       Neither Spain, the Trust, nor IP Acquisition entered into an agreement with S1 Audio to assume its liabilities after purchasing its assets.

¶ 15                          Communications Between the Parties
¶ 16                                Settlement Negotiations

¶ 17       IP Acquisition contends that Spain, as the Trust's trustee, periodically sought information on when the loans to S1 Audio would be repaid. Defendants claim that in 2011, five months before the foreclosure, Spain threatened to foreclose on the Trust's secured interest in S1 Audio's intellectual property. That fall, Spain advised Gantz that the Trust lost confidence in the ability of S1 Audio to meet its obligations and advised Gantz that the trust would foreclose its security interest. According to defendants, Gantz was "not happy with the situation" and stayed out of the foreclosure process.

¶ 18       Between September 2011 (before the foreclosure) and January 24, 2012 (after the foreclosure), Spain, through his then counsel, Ken Obel, and Villaverde, through his counsel,

the Prinz Law Firm, participated in settlement conversations. During a September 2011 meeting, Spain explained that he was attempting to settle Villaverde's litigation against S1 Audio because he was trying to sell the intellectual property. During defendants' first written offer for Villaverde to share in the proceeds from any sale or license of the intellectual property, defendants outlined three different payment scenarios in exchange for Villaverde agreeing to dismiss his wage litigation, and, in all three, Villaverde's ability to share in the proceeds was second only to Spain's. The agreement would allow Villaverde to still pursue the amounts he was owed if S1 Audio could not sell or license the intellectual property within six months of the agreement. Defendants sent Villaverde their second written settlement offer in December 2011. Again, Villaverde's payment would be second only to Spain, but Gantz could receive proceeds only after Villaverde was paid in full. Defendants made a third written offer in January 2012–if Villaverde was not fully paid by April 29, 2012, the release he provided would be ineffective and he could pursue a claim for any deficiency. Again, Gantz would not receive proceeds from the sale or license of the intellectual property until Villaverde was paid in full.

¶ 19     On May 31, 2013, Gantz filed for bankruptcy and was removed from this litigation.

¶ 20                                   Email Correspondence

¶ 21     On February 9, 2011, Spain emailed Gantz,

"It may be time to go BK to clear a bunch of this stuff up or at a minimum do an assignment for creditors. This will get rid of EAR [investor–Equipment Acquisition Resources] as well. Does Gould [counsel for Defendants] have a BK lawyer we can talk to? I will get the IP in a BK, but I will contribute it to a new company."

On February 17, Spain wrote, "If we BK the company, which I think we must, I will have a total nuisance of a co-security interest holder with an aggressive uninformed atty." That same day, he wrote, "I really don't want them to have access to IP. Please don't give them that." Five days later, Spain wrote, "getting the IP out of Sync1 ASAP is very important though."

¶ 22     On March 28, 2011, Spain stated,

"I looked at Assignment FBC again and I think this may be a viable way to go if you abandon the old company and sell the assets to the new company. I am not sure how slow you can go. Also, it does not stop court proceedings but makes them pretty pointless, effectively stopping many of them."

¶ 23     In October 2011, Spain sent two emails to Gantz. In the first email, Spain wrote,

"We need to be ready to foreclose on the assets by Monday, as we don't want a judgment entered next week. It will go better for all if we have your cooperation and get your signature on the documents this week."

The next day, Spain emailed Gantz again and wrote,

"And if Villaverde gets a judgment and the IP is still in the company he will likely get paid before me. The only way [I] know that I can make sure I get paid first and completely (assuming there is any cash) is to own the IP."

¶ 24     On March 12, 2013, well after Villaverde received a judgment on his unpaid wages, Spain wrote Gantz, "It would have been simple as hell not to book [employees'] compensation as salary and we would both have been spared a lot of grief and expense."

Summary Judgment and Sanction Motions

¶ 26 On February 19, 2014, the trial court granted summary judgment in favor of IP Acquisition, holding that IP Acquisition had a perfected security interest and did not violate the UFTA (740 ILCS 160/1 *et seq.* (West 2010)). The court further found no evidence of civil conspiracy.

¶ 27 The court denied Villaverde's motion to reconsider, stating:

"This court found that even assuming IP Acquisition was the successor of S1Audio, Inc. a fact for which there was no evidentiary support, there was no wrongdoing for which IP Acquisition could be held liable. The foreclosure of the IP was not fraudulent, but specifically authorized by the Uniform Commercial Code ***. IP Acquisition foreclosed on a valid lien as it was entitled to under the Uniform Commercial Code."

¶ 28 On September 19, 2014, the trial court denied IP Acquisition's Rule 137 motion. The court held that sanctions would "punish a party or attorney for being zealous, yet unsuccessful." The court explained that although it found Villaverde's legal arguments to be "unconvincing," sanctions could not be used to punish him for "misapplying the law." Even though the court found the evidence did not support Villaverde's position, it concluded that Villaverde acted reasonably in filing suit.

¶ 29 ANALYSIS

¶ 30 Villaverde argues errors of law and fact and that the trial court's holding "allows unscrupulous businesspersons to avoid a court judgment by merely changing the form of the transfer of assets."

¶ 31 Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2010). Summary judgment should be entered whenever the plaintiff fails to establish a *prima facie* case on an essential element of his or her claim. *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989). We review the trial court's decision to grant summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

¶ 32 Uniform Commercial Code Applicability to Successor Liability

¶ 33 Villaverde asserts that the trial court premised its denial of his claims on the notion that a Uniform Commercial Code sale preempts any claim for successor liability. IP Acquisition responds that the trial court did and said no such thing. We agree. The ruling on summary judgment does not turn on whether a UCC sale preempts successor liability, and Villaverde's argument to the contrary is without merit. The trial court entered summary judgment in IP Acquisition's favor because "there was no evidence in the record to support [Villaverde's] allegations that any of the defendants qualified as successors of S1" and "the record was devoid of any evidence of a tortious or unlawful act by IP Acquisition, Spain, or the Trust which would support a conspiracy claim."

¶ 34 Illinois Uniform Fraudulent Transfer Act

¶ 35 Villaverde maintains that IP Acquisition served as a continuation of S1 Audio and defendants concocted the foreclosure sale for the fraudulent purpose of escaping liability. Villaverde accuses S1 Audio, through Gantz, of colluding with Spain, to place the only

valuable asset–the intellectual property (NxSet)–into a new corporation (IP Acquisition) to avoid paying Villaverde's wage litigation judgment. Villaverde raises, as genuine issues of material fact, whether the foreclosure proceedings and public sale were fraudulent. According to Villaverde, the trial court improperly concluded that IP Acquisition could be liable under the fraud exception to successor liability only after a fraudulent transfer as provided in the UFTA (740 ILCS 160/1 *et seq.* (West 2010)).

¶ 36    Defendants respond that they did not participate in fraud. Rather, as a secured creditor of S1 Audio, IP Acquisition properly foreclosed and bought S1 Audio's intellectual property at a public sale. IP Acquisition offered to share the proceeds of any sale or license of the intellectual property with Villaverde, both before and after the foreclosure of S1 Audio, despite no legal obligation to do so. Villaverde counters that the facts as presented, specifically the relevant email correspondence, as well as Spain's and Gantz's conduct, create issues of material fact sufficient to defeat IP Acquisition's motion for summary judgment.

¶ 37    The UFTA allows a creditor to defeat a debtor's transfer of assets to which the creditor was entitled. 740 ILCS 160/5 (West 2010). Under the controlling definitions of the UFTA, the intellectual property here was not an "asset" and its "transfer" could not be a violation of the UFTA. " 'Asset' means property of a debtor, but the term does not include *** property to the extent it is encumbered by a valid lien." 740 ILCS 160/2(b)(1) (West 2010). Accordingly, the trial court properly granted summary judgment on count I of Villaverde's complaint.

¶ 38    We disagree with Villaverde that the trial court based its ruling on count II (successor liability) and count III (civil conspiracy) on its denial of count I. The trial court addressed each claim individually, as will we.

¶ 39                    Successor Corporate Liability

¶ 40    Generally, when a corporation sells its assets to another corporation, the seller's liabilities do not become a part of the successor corporation unless an agreement so provides. *Diguilio v. Goss International Corp.*, 389 Ill. App. 3d 1052, 1060-61 (2009) (citing *Vernon v. Schuster*, 179 Ill. 2d 338, 345 (1997)). But, four exceptions apply: (1) the transaction includes an express or implied agreement of assumption; (2) the transaction constitutes a consolidation or merger of the purchaser or seller corporation; (3) the purchaser is a continuation of the seller; or (4) the transaction is an improper attempt to escape liability for the seller's obligations. *Id*. at 1060.

¶ 41    Villaverde argues, based on the evidence, that he met two exceptions to the general rule of successor corporate nonliability: (1) the transaction between S1 Audio and IP Acquisition was an attempt by the seller to escape liability for its obligations to Villaverde (exception 4) and (2) IP Acquisition exists as a continuation of S1 Audio (exception 3).

¶ 42                    Evading Liability Exception

¶ 43    Villaverde argues IP Acquisition's conduct before and after the 2011 foreclosure sale offers evidence that fraud tainted the transactions. As support, Villaverde offers these facts he claims are undisputed: (1) Villaverde filed a successful lawsuit for unpaid wages; (2) during the wage litigation, Spain sent several emails to Gantz in which Spain expressed concern Villaverde would receive a judgment; (3) Spain sent Gantz the only default notice less than two weeks after the emails and four years of no repayment; and (4) IP Acquisition conducted the foreclosure sale less than two months after Spain admitted he did not want a "judgment

entered." Villaverde also attaches great significance to his claim that Spain sought Gantz's "corroboration." As further evidence the sale attempts to escape liability, Villaverde questions the notice of the foreclosure sale being published solely in the Chicago Daily Law Bulletin and appearance of only the secured creditor at the public auction. Villaverde challenges the relevancy of IP Acquisition's security interest in the intellectual property because "it is clear" the intent of the foreclosure sale was to avoid his judgment.

¶ 44        In addition, Villaverde relies on the factors outlined in the UFTA to support his claim of fraud. The UFTA offers 11 "badges of fraud" to consider when determining actual intent: "(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 740 ILCS 160/5(b) (West 2010); see also *Kennedy v. Four Boys Labor Services, Inc.*, 279 Ill. App. 3d 361, 369 (1996). The presence of these "badges of fraud" may give rise to an inference or presumption of fraud; they are "considerations" the trial court should use in determining whether fraud occurred. *Steel Co. v. Morgan Marshall Industries, Inc.*, 278 Ill. App. 3d 241, 251 (1996) (citing *Kaibab Industries, Inc. v. Family Ready Homes, Inc.*, 80 Ill. App. 3d 782, 786 (1978) (four "badges of fraud" sufficient to give rise to inference of fraud)).

¶ 45        Villaverde relies on badges 4, 5, 8, 9, and 10, arguing the following: Before the foreclosure, Spain was aware that Villaverde had filed suit against Gantz and S1 Audio for unpaid wages (4). IP Acquisition acquired the intellectual property–S1 Audio's most valuable asset–during the foreclosure (5 and 9), after which, Gantz personally filed bankruptcy (9). Although Gantz originally paid $750,000 for the intellectual property, IP Acquisition received their security interest in the intellectual property for $100,000 (8). During the wage litigation, the court entered a substantial judgment against S1 Audio and Gantz for Villaverde's unpaid wages (10).

¶ 46        Villaverde further contends the record supports finding badges 1, 2, 3, and 11. Spain and Gantz have been friends since 1979 and, hence, even if they are not "insiders," their 30-year relationship meant they were unable to bargain at arm's-length (1). After the foreclosure, Gantz continued with his same day-to-day duties. Potential clients assumed Gantz owned the patent and rarely spoke to Spain (2). By advertising the intellectual property sale in the Chicago Daily Law Bulletin, the defendants essentially concealed the transfer, particularly in light of the absence of an outside bidder at the auction (3). Lastly, when the Spain Trust transferred its interest in the intellectual property to IP Acquisition, the debtor transferred essential assets to a lienor who transferred the assets to an insider, because Spain controls both entities (11).

¶ 47        We disagree with Villaverde's major contention–that the trial court held the foreclosure sale automatically terminates successor liability. The court's holding relates only to the facts as presented. The foreclosure sale was not an improper attempt to shed the debt obligations of

unsecured creditors, such as Villaverde, but a proper means for the secured creditor to collect on its debt after a default and, therefore, any exception to the general rule against successor liability was inappropriate. See 15 William Meade Fletcher *et al.*, Private Corporations § 7333, at 642-44 (perm. ed. 1999) ("where an individual purchases the assets of a corporation at a foreclosure sale and then resells to a new company composed largely of the members of the company whose assets were sold, and there is no fraud, the new company is not liable for the debts of the old").

¶ 48    We agree with the trial court that the so-called badges of fraud identified by Villaverde do not establish, individually or collectively, that the foreclosure transaction was a fraud to avoid paying Villaverde his judgment. Examining the factors listed in section 5(b) of the UFTA, there is not a significant number of "badges of fraud" present to support a presumption of fraud. Under the UFTA, when the debtor is a corporation, like S1 Audio, an "insider" includes a director of the corporation, an officer of the corporation, anyone in control of the corporation, and a relative of a person in control of the corporation. 740 ILCS 160/2(g)(2) (West 2010). Spain does not qualify as an insider but as a creditor of S1 Audio (1). His friendship with Gantz does not alter his role relative to the corporation. Neither S1 Audio nor Gantz retained possession or control of the intellectual property after the foreclosure sale (2). Before the foreclosure sale, the Trust irrevocably sold and assigned its security interest in S1 Audio to IP Acquisition, whose managing member was Spain (who never worked for S1 Audio). Subsequently, IP Acquisition bid an amount equal to the amount S1 Audio owed under the promissory notes and obtained its intellectual property. IP Acquisition hired Gantz as an independent contractor for his expertise to help in IP Acquisition's efforts to sell or license the intellectual property; Gantz's employment does not mean he possessed or controlled the intellectual property. Spain and IP Acquisition controlled the intellectual property after the foreclosure. Defendants never tried to conceal the transfer of the asset (3) and actually kept Villaverde up to date on the intellectual property and offered to share the proceeds of any sale or license before or after the foreclosure. The debtor had not been sued or threatened with suit before the transfer was made or the obligation incurred (4). Between 2009 and 2010, the Trust purchased promissory notes from S1 Audio in return for a security interest in the intellectual property. Villaverde did not seek judgment or any other relief against S1 Audio and Gantz until at least December 14, 2011. Accordingly, the obligation was incurred well before the threat of suit.

¶ 49    Whether the transfer was of substantially all the debtor's assets (5) is the only factor that potentially supports a finding of fraud. From the record before us, S1 Audio's only asset was the intellectual property. This factor, however, is neutral at best because there is no in-depth discussion concerning whether S1 Audio owned other intellectual property or was involved in any other business pursuits. Gantz has not absconded (6); he actively sought to sell or license the intellectual property as an employee of IP Acquisition after the foreclosure sale. The intellectual property is the only asset at issue and Villaverde never contended its existence was concealed from him (7). The valuation of the intellectual property does not support finding fraud (8) where the undisputed facts establish the current value as $5,000 based on an outside bid at the online auction. The record shows Gantz personally filed bankruptcy, but there is no evidence concerning how S1 Audio fared following the foreclosure, so (9) does not support a finding of fraud. No allegation was made that the transfer of the intellectual property occurred before a substantial debt (10); in fact, the foreclosure sale took place four years after the

promissory notes were executed. Lastly, there was no allegation that a third party was involved (11)–neither S1 Audio nor Gantz transferred the intellectual property to a lienor who transferred the assets to an insider. The undisputed facts do not support finding an inference of fraud based on the factors listed in section 5(b) of the UFTA.

¶ 50 Further, we are unpersuaded by Villaverde's position regarding the value of the intellectual property. Even though a third party valued the intellectual property at $800,000 at one point and Gantz originally paid $750,000 for it, the only current valuation was the $5,000 bid received during the public online auction in the Spring 2012. Accordingly, Spain's acquiring of the intellectual property as a security interest for his loan of $100,000 was not inadequate. Likewise, we are unpersuaded that the foreclosure process itself establishes fraud. Villaverde's suggestion cannot be reconciled with defendants' repeated attempts to have Villaverde share in the proceeds from any sale or license of the intellectual property. Additionally, after the foreclosure, defendants attempted to sell or market the intellectual property almost immediately and continued their offer to have Villaverde share in the proceeds.

¶ 51 Nor does the email correspondence indicate fraudulent intent. The email exchange shows a creditor exercising its right to be informed about its loan and the likelihood of repayment. Undisputed is that only Spain and his counsel participated in the foreclosure process.

¶ 52 Both before and after the foreclosure sale, defendants, who were under no legal obligation to do so, offered to enter into an agreement with Villaverde to provide him with proceeds from the license or sale of the IP, but he refused. Before the foreclosure sale, defendants were motivated by their need to sell the IP to recoup their investment and likely believed it would be easier to sell without Villaverde's judgment. After the foreclosure, defendants, as a successor corporation, were under no legal obligation to pay Villaverde's judgment but, again, probably believed it would be easier to sell the IP without it.

¶ 53 Continuation Exception

¶ 54 Villaverde argues the undisputed facts also establish that IP Acquisition serves as a continuation of S1 Audio and should be liable for his wage litigation judgment. Villaverde finds it significant that both before and after the foreclosure, Gantz and Spain were the only individuals who could receive any money from the sale or license of the intellectual property, and both had the same essential duties before as after the sale.

¶ 55 The correct standard for evaluating whether the continuation exception applies is set out in *Vernon v. Schuster*, 179 Ill. 2d 338, 346 (1997), cited by defendants, and not *Steel Co. v. Morgan Marshall Industries, Inc.*, 278 Ill. App. 3d 241 (1996), as suggested by Villaverde. Illinois courts have held that the most important factor in determining whether a merger has occurred for purposes of the continuation exception is the identity of the ownership of the new and former corporations. *Vernon*, 179 Ill. 2d at 346-47; see also *Diguilio v. Goss International Corp.*, 389 Ill. App. 3d 1052, 1062 (2009) (deciding factor whether there is a continuation of corporate entity of seller, not whether seller's business operation continues). The exception seeks to avoid the situation that would "allow the predecessor to escape liability by merely changing hats." (Internal quotation marks omitted.) *Vernon*, 179 Ill. 2d at 346.

¶ 56 Spain, the owner of IP Acquisition, was not an officer, director, or stockholder of S1 Audio–he was a creditor. Gantz, the CEO of S1 Audio is not an officer, director, or stockholder of IP Acquisition–he is an employee/independent contractor. The focus for the continuation exception is on the corporate entity of the seller and not whether there is a continuation of the

seller's business operation. See *id.* at 347 (identity of ownership necessary to impose successor liability).

¶ 57 No identity of ownership between S1 Audio and IP Acquisition exists that would justify the application of the continuation exception to the general rule of successor corporate nonliability. Under these facts, IP Acquisition, as a secured creditor of S1 Audio, properly foreclosed on the secured collateral following default and collected on its debt. As a successor corporation, IP Acquisition is not liable for the debts of S1 Audio and, because none of the four exceptions apply, summary judgment in IP Acquisition's favor is proper.

¶ 58                                          Civil Conspiracy

¶ 59 Villaverde argues the foreclosure sale was a civil conspiracy intended to delay recovery of his unpaid wages.

¶ 60 "Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means. *** A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62-63 (1994).

¶ 61 As support for this position, Villaverde relies on *Zokoych v. Spalding*, 36 Ill. App. 3d 654, 667 (1976), in which the court found a secured creditor bank cooperated with a co-owner of a business in a scheme to breach his fiduciary obligations to his fellow owner and, thus, engaged in a conspiracy to commit fraud. The bank claimed to be protecting its secured interest in company machinery from a third-party creditor by allowing the defendant co-owner to unilaterally transfer the secured machinery. *Id.* The court found the bank acted against the company and other co-owner's rights by knowingly allowing the secured assets to be converted by the defendant co-owner without default on the underlying loan and with knowledge of the plaintiff co-owner's interest in the company. *Id.*

¶ 62 We disagree that *Zokoych* resembles the facts here. The Spain Trust, the primary secured creditor of S1 Audio, enforced its undisputed right to foreclose on the secured collateral (intellectual property) following default. IP Acquisition took no action that defrauded, hindered, or delayed Villaverde from receiving his judgment. In contrast, IP Acquisition presented evidence of communication with Villaverde both before and after the foreclosure for him to share in any proceeds from the sale or license of the intellectual property.

¶ 63 The trial court properly found that the foreclosure and subsequent licensing of the intellectual property did not violate the UFTA and, therefore, there is no unlawful act to support a cause of action for a civil conspiracy. We affirm the trial court's decision to grant summary judgment on the civil conspiracy claim.

¶ 64                                     Summary Judgment Affirmed

¶ 65 Villaverde fails to present a question of material fact precluding summary judgment for defendants and the trial court correctly found no exception to the doctrine of successor nonliability.

¶ 66                       Cross-Appeal on Denial of Rule 137 Sanctions

¶ 67        Defendants' cross-appeal on the denial of Rule 137 sanctions for the filing of a vexatious and harassing lawsuit. They argue that Villaverde and his counsel sought a guaranteed payment through a lawsuit which purposely omitted key facts. As defendants tell it, Villaverde and his counsel "twist the story and try to make it fit into the theory underlying their nuisance pleading, ultimately setting forth a false and misleading version of the truth."

¶ 68        Rule 137 provides a mechanism to keep parties from abusing the judicial process through the availability of sanctions for "vexatious and harassing actions" based on unsupported allegations of fact or law. (Internal quotation marks omitted.) *Burrows v. Pick*, 306 Ill. App. 3d 1048, 1050 (1999). The party moving for sanctions must show the other side made untrue and false allegations without reasonable cause. *Id.* at 1050-51. The trial court uses an objective standard to determine whether the party made a reasonable inquiry into the facts and law supporting the allegations. *Id.* at 1051.

¶ 69        We will uphold a ruling on Rule 137 sanctions unless the trial court abused its discretion. *Yassin v. Certified Grocers of Illinois, Inc.*, 133 Ill. 2d 458, 467 (1990). The trial court, which sits in the best position to evaluate the circumstances, abuses its discretion only if no reasonable person would take its view. *Fremarek v. John Hancock Mutual Life Insurance Co.*, 272 Ill. App. 3d 1067, 1074 (1995). Courts consider an allegedly offending complaint at the time of its filing rather than engage in hindsight. *Lewy v. Koeckritz International, Inc.*, 211 Ill. App. 3d 330, 334 (1991). In reviewing the trial court's decision, we determine whether it was "informed, based on valid reasons, and followed logically from the circumstances of the case." *Burrows*, 306 Ill. App. 3d at 1051 (citing *In re Estate of Smith*, 201 Ill. App. 3d 1005, 1009-10 (1990)).

¶ 70        The trial court thoroughly examined the sanctions' motion before issuing its ruling. As the trial court observed in its Memorandum and Order, "[w]hile this court ultimately found plaintiff's legal arguments to be unconvincing, sanctions are not intended to punish litigants for misapplying the law." As for the evidence, the trial court observed that despite having concluded that the evidence did not support Villaverde's claims, "this does not mean that plaintiff could not reasonably argue that the facts supported [his] position. Defendants have failed to persuade us that the trial court abused its discretion in finding that Villaverde made a reasonable inquiry into the facts, a good faith argument, and did not file his suit for the improper purpose of harassment. Accordingly, we will not disturb the trial court's denial of Rule 137 sanctions.

¶ 71                                   CONCLUSION

¶ 72        We affirm both the grant of summary judgment and the denial of sanctions.

¶ 73        Affirmed.