# Illinois Official Reports

## Appellate Court

> ### *People ex rel. Department of Human Rights v. Oakridge Nursing & Rehab Center*,
> ### 2019 IL App (1st) 170806

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* THE DEPARTMENT OF HUMAN RIGHTS, Plaintiff-Appellant, v. OAKRIDGE NURSING & REHAB CENTER, a/k/a OAKRIDGE REHABILITATION CENTER, and OAKRIDGE HEALTHCARE CENTER, LLC, Defendants (Oakridge Healthcare Center, LLC, Defendant-Appellee). |
| District & No. | First District, First Division<br>Docket No. 1-17-0806 |
| Filed<br>Rehearing denied | March 11, 2019<br>March 29, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CH-13917; the Hon. Franklin U. Valderrama, Judge, presiding. |
| Judgment | Reversed and Remanded. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Aaron T. Dozeman, Assistant Attorney General, of counsel), for appellant.<br><br>Richard Lee Stavins, of Robbins, Salomon & Patt, Ltd., of Chicago, for appellee. |

| Panel | JUSTICE WALKER delivered the judgment of the court, with opinion.
Justice Pucinski concurred in the judgment and opinion.
Justice Mason dissented, with opinion. |

**OPINION**

¶ 1    On February 7, 2011, Jane Holloway, an employee of Oakridge Convalescent Home (Convalescent), filed a charge of discrimination in violation of the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2010)) against Oakridge Nursing & Rehab Center, LLC (Oakridge Center), her employer and the managing company of Convalescent. Oakridge Center received notice of the charge in the spring of 2011 and thereafter transferred substantially all of its assets for no consideration to Oakridge Healthcare Center, LLC (Oakridge Healthcare). Oakridge Healthcare became the new manager of Convalescent. Holloway obtained an administrative judgment of $30,880. When Oakridge Center failed to satisfy the judgment, the State filed a complaint against Oakridge Healthcare, as the successor of Oakridge Center, to enforce compliance with Holloway's judgment. Oakridge Healthcare filed a motion for summary judgment, which the circuit court granted. The State appeals and argues that it presented sufficient evidence to create a material issue of fact that Oakridge Center transferred its assets for the fraudulent purpose of escaping Holloway's judgment. Furthermore, the State urges this court to look to federal common law, where successor liability is recognized as the default rule in employment discrimination cases. The State maintains that recognition of successor liability in employment discrimination cases aids victims to enforce judgments against employers involved in discriminatory practices who might otherwise escape liability.

¶ 2                            I. BACKGROUND
¶ 3                A. Helen Lacek and Elisha Atkin Business Relationship
¶ 4    Ms. Helen Lacek (Helen), managing member of Oakridge Center, met Mr. Elisha Atkin (Elisha), managing member of Oakridge Healthcare, while working at a nursing home in 1991. In 1993, Helen met Joel Atkin, Elisha's brother. In 1999, Helen and Elisha worked as managers for a different nursing home. In 2001, Helen became a member and the director of operations for another nursing home where she met Donna Atkin, Elisha's wife, and Jay Orlinsky, Elisha's brother-in-law. Thereafter, Helen and Elisha worked for a nursing home management company as director of operations and CEO respectively. In December of 2007, Helen, Donna, and Jay formed McAllister Nursing and Rehab, LLC (McAllister), a nursing home management company that operated a nursing home in a building that was owned by McAllister Nursing & Rehab Properties, LLC (McAllister Properties), comprised of members Joel and Donna and an insurance company. Elisha stated in his deposition that he was also a member of McAllister.

¶ 5    On May 1, 2008, Helen, and her husband, John Lacek, formed Oakridge Center and were the company's only members; Helen was the company's only managing member. On the same day, Elisha, Donna, Joel, and Jay formed Oakridge Nursing & Rehab Properties, LLC

(Oakridge Properties), and Elisha, Donna, and Joel were the company's managing members.

### B. Convalescent Nursing Home

On June 1, 2008, both Oakridge Center and Oakridge Properties executed separate agreements with Accera-Oakridge (Accera), a nursing home management company, for the management of Convalescent. Oakridge Center's agreement provided that Accera would transfer Convalescent's personal property to Oakridge Center, and Oakridge Center would become Convalescent's new management company. Oakridge Properties agreed to acquire the land and building where Convalescent was operated at 323 Oak Ridge Avenue, Hillside, Illinois. Oakridge Center and Oakridge Properties executed a lease for the continued operation of Convalescent by Oakridge Center at the same location. Oakridge Center employed 85 workers at Convalescent.

### C. Human Rights Complaint

On February 7, 2011, Holloway, who was an employee at Convalescent, filed the charge of discrimination against Oakridge Center with the Department of Human Rights (Department) and alleged that Oakridge Center suspended her because of her age, 50, and terminated her because of her physical disabilities, in violation of section 2-102(A) of the Act. 775 ILCS 5/2-102(A) (West 2010). Helen stated in her deposition that she became aware of the charge "in spring 2011." On September 26, 2012, the Department filed a civil rights violation complaint on behalf of Holloway with the Illinois Human Rights Commission (Commission). When Oakridge Center failed to file an appearance with the Commission, a default order was entered against it on February 5, 2013. On September 17, 2013, the chief administrative law judge of the Commission recommended a judgment of $30,880 for lost back pay with prejudgment interest to be awarded to Holloway. On April 3, 2014, the Commission entered the administrative law judge's September 17, 2013, recommendation as its order. On July 16, 2014, the Commission ordered the Department to "commence an action in the name of the People of the State of Illinois praying for an issuance of an order directing the Respondent, [Oakridge Center], its agents, servants, successors and assigns" to comply with the Commission's April 3, 2014, judgment.

### D. Oakridge Center's Financial Troubles

Helen stated in her deposition that in June 2011, Oakridge Center began to experience financial trouble because the state of Illinois stopped making its payments to Oakridge Center. Helen further stated that due to Oakridge Center's financial trouble, the company was no longer able to pay its rent to Oakridge Properties. Therefore, it provided Oakridge Properties with notice to terminate its lease. The lease required Oakridge Center to pay an early termination fee of $210,000, personally guaranteed by Helen, but Helen stated she could not answer whether the termination fee was paid because her husband "handled a lot of the financial stuff."

¶ 12                    E. Oakridge Healthcare's Formation and Oakridge Center's Termination

¶ 13        On December 5, 2011, Elisha formed Oakridge Healthcare with Yael Atkin, Elisha's sister-in-law and Joel's wife, as the company's only members, with Elisha as the sole managing member.

¶ 14        On January 1, 2012, Oakridge Center, Oakridge Properties, and Oakridge Healthcare entered into a "lease and option termination, cancellation and indemnity agreement" (termination agreement). The termination agreement concluded the lease between Oakridge Center and Oakridge Properties and assigned the lease to be between Oakridge Properties and Oakridge Healthcare. On the same day, the parties also executed an "operations transfer agreement" (transfer agreement) to transfer to Oakridge Healthcare all of Oakridge Center's (i) property, (ii) contracts, (iii) licenses, (iv) patient records, (v) patient trust funds, and (vi) supplies. Oakridge Center however retained all of its accounts receivable. In her deposition, Helen stated that Oakridge Center transferred "beds, the license, three days worth of perishable foods, seven days of frozen [food], stock meds, medical supplies, maybe a couple reams of paper." She further stated that Oakridge Center never appraised the transferred assets for value, and it never received any payment for them.

¶ 15        The transfer agreement also included a "no assumption of liabilities" section, which provided that Oakridge Healthcare (i) "is not, and shall not under any circumstances, be deemed or interpreted to be, a parent, subsidiary and/or and affiliate of Oakridge Center" and (ii) "is not assuming or purchasing and shall not be responsible or liable for any of [Oakridge Center's] liabilities."

¶ 16        Helen stated in her deposition that Oakridge Center's last day of operating Convalescent was January 1, 2012, which was the same day Oakridge Center transferred it assets to Oakridge Healthcare. At the time Oakridge Center was dissolved, it had zero assets. After shutting down the operation of Convalescent, Helen then worked for a hospice facility from January 2012 to February 2013. In August 2013, she returned to work as administrator at McAllister.

¶ 17                                    F. Circuit Court Proceedings

¶ 18        On September 22, 2015, the State filed a two count complaint and named as defendants Oakridge Center and Oakridge Healthcare and requested that the court enter an order against the two companies and its "agents, servants, successors, and assigns" to comply with the Commission's April 3, 2014, judgment. Count I sought to enforce the judgment against Oakridge Center. Count II, titled "successor liability," sought similar relief, but it was asserted against Oakridge Healthcare. Under count II, the State asserted, in part, that (i) "[o]n information and belief, when [Oakridge Healthcare] began operating [Convalescent] it was aware of [c]omplainant's charge of employment discrimination with the Department," and (ii) "[b]ased on these facts, on information and belief, [Oakridge Healthcare] is a successor limited liability company of [d]efendant [Oakridge Center], and is therefore responsible for the liabilities of [Oakridge Center]."

¶ 19        On November 16, 2015, Oakridge Healthcare filed a motion for summary judgment on count II of the State's complaint predicated on section 2-1005(b) of the Code of Civil Procedure (Code). 735 ILCS 5/2-1005(b) (West 2014). Oakridge Healthcare argued that it was entitled to judgment as a matter of law because, under Illinois law regarding successor liability, a successor company is not liable for its predecessor's liabilities. Oakridge Healthcare also specifically addressed all four exceptions to the general rule of successor corporate

nonliability, including the fraudulent purpose exception, and argued that there was not sufficient evidence to support application of any of the exceptions.

¶ 20    On August 3, 2016, the State filed a response to Oakridge Healthcare's motion for summary judgment. The State argued that because Holloway's judgment stemmed from a charge of employment discrimination in violation of the Act, the court should look to the federal doctrine of successor liability because Illinois courts look to standards applied to federal claims brought under federal employment discrimination laws in analyzing discrimination claims brought pursuant to the Act.

¶ 21    On December 19, 2016, the circuit court found that (i) there was no issue of material fact that Oakridge Healthcare was not a successor in liability to Oakridge Center, (ii) the State did not establish that Oakridge Healthcare was merely a continuation of Oakridge Center, or that the transaction was made for the fraudulent purpose of escaping liability, and (iii) the court stated that pursuant to the rule of *stare decisis*, it was bound to follow Illinois law regarding successor nonliability and, therefore, the court was not free to follow federal authority. Accordingly, the court entered an order granting Oakridge Healthcare's motion for summary judgment and on February 14, 2017, entered a judgment against Oakridge Center for $51,418.26, but did not impose personal liability "upon any individual who is an agent, servant, successor or assign of either [Oakridge Center or Oakridge Healthcare]."

¶ 22    On March 22, 2017, the State filed its notice of appeal, seeking a reversal of the December 19, 2016, order granting Oakridge Healthcare's motion for summary judgment.

¶ 23                                II. ANALYSIS

¶ 24                              A. Standard of Review

¶ 25    The State contends that the circuit court erred when it granted Oakridge Healthcare's motion for summary judgment predicated on section 2-1005(b) of the Code. 735 ILCS 5/2-1005(b) (West 2016). Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* § 2-1005(c). Summary judgment orders are reviewed *de novo*. *Lake County Grading Co. v. Village of Antioch*, 2014 IL 115805, ¶ 18.

¶ 26                    B. Forfeiture of Fraudulent Transfer Argument

¶ 27    The State contends it presented sufficient evidence for a reasonable jury to find that the asset transfer was for the fraudulent purpose of escaping Holloway's judgment. Oakridge Healthcare argues, and the dissent agrees, that the State never raised the fraudulent transfer argument at any stage of the proceedings in the trial court, only raising it for the first time on appeal, and therefore the State forfeited the argument. Furthermore, Oakridge Healthcare argues that the transfer was not done with intent to defraud Holloway because at the time of the transfer (i) "no one had given any thought whatsoever to [Holloway's] *pro se* administrative charge," (ii) "there was no existing indebtedness to Holloway," and (iii) "no person involved in the transfer had the divine ability to foretell the future, and that therefore when the asset transfer was made in 2012 no one could know that [Holloway] would receive an award in 2014." We disagree.

¶ 28    Section 2-603 of the Code provides that "[a]ll pleadings shall contain a plain and concise statement of the pleader's cause of action" and "[p]leadings shall be liberally construed with a view to doing substantial justice between the parties." 735 ILCS 2-603(a), (c) (West 2016). Our supreme court has held that a "plaintiff must allege facts sufficient to bring a claim within a legally recognized cause of action." *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 368 (2004); see also *People ex rel. Fahner v. Carriage Way West, Inc.*, 88 Ill. 2d 300, 308 (1981) (the court held that in order to pass muster a complaint "must be legally sufficient; it must set forth a legally recognized claim as its avenue of recovery" and "must be factually sufficient; it must plead facts which bring the claim within the legally recognized cause of action alleged").

¶ 29    Here, the State alleged in count II of its complaint, titled "successor liability," that (i) "[o]n information and belief, when [Oakridge Healthcare] began operating [Convalescent] it was aware of [c]omplainant's charge of employment discrimination with the Department" and (ii) "[b]ased on these facts, on information and belief, [Oakridge Healthcare] is a successor limited liability company of [d]efendant [Oakridge Center], and is therefore responsible for the liabilities of [Oakridge Center]." We find the aforementioned facts were sufficient to set forth a cause of action pursuant to the fraudulent transfer exception to the general rule of successor corporate nonliability. See *Beretta U.S.A. Corp.*, 213 Ill. 2d at 368; *Carriage Way West, Inc.*, 88 Ill. 2d at 308. We are further convinced that these alleged facts were sufficient to set forth a cause of action because as the record indicates, and as the dissent notes, Oakridge Healthcare, in its response to the motion for summary judgment, specifically addressed all four exceptions to the general rule of successor corporate nonliability, including the fraudulent purpose exception. We find it implausible for Oakridge Healthcare to now argue that the State never raised the fraudulent transfer exception in the trial court when Oakridge Healthcare specifically addressed the exception based on the facts the State provided in the complaint. Therefore, because we find that these facts were sufficient to set forth a cause of action pursuant to the fraudulent transfer exception to the general rule of successor corporate nonliability, and that Oakridge Healthcare specifically addressed the fraudulent transfer exception, we hold that this argument was not raised for the first time on appeal and the State did not forfeit the argument.

¶ 30    Furthermore, in *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 33, our supreme court held that "waiver and forfeiture rules serve as an admonition to the litigants rather than a limitation upon the jurisdiction of the reviewing court and that courts of review may sometimes override considerations of waiver or forfeiture in the interests of achieving a just result and maintaining a sound and uniform body of precedent." We note that the supreme court in *Jackson* cautioned that while the proposition that waiver and forfeiture are limitations on the parties and not on the court, that principle does not confer upon reviewing courts unfettered authority to consider forfeited issues at will. *Id.* Based upon this caution, the dissent opposes consideration of the State's argument because it does not provide a just result nor does it maintain a uniform body of precedent. The dissent contends that the trial court's holding was properly founded on well-settled Illinois authority and that our holding consequently contradicts "a sound and uniform body of precedent." *Infra* ¶ 77. For reasons provided below, we respectfully disagree because this is a case of first impression and our consideration of the State's arguments will achieve a just result for the parties involved. Therefore, in the interest of achieving a just result, we shall address the State's contention that it presented sufficient

evidence to create a material issue of fact that Oakridge Healthcare would be liable for Holloway's judgment as a successor to Oakridge Center.

¶ 31                                C. Successor Liability

¶ 32     In *Vernon v. Schuster*, 179 Ill. 2d 338, 344-45 (1997), our supreme court held that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation. The rule of successor corporate nonliability has the purpose of protecting *bona fide* purchasers from unassumed liability. *Id.* at 345. It was created to improve the fluidity of corporate assets. *Id.* There are four exceptions to the general rule of successor corporate nonliability: (1) where there is an express or implied agreement of assumption, (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation, (3) where the purchaser is merely a continuation of the seller, or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. *Id.* Here, there is evidence the transfer may have been made for the fraudulent purpose of escaping Oakridge Center's obligation to Holloway.

¶ 33                                  1. Fraud in Fact

¶ 34     Illinois recognizes two categories of fraudulent transfers: "fraud in law" and "fraud in fact." *Bank of America v. WS Management, Inc.*, 2015 IL App (1st) 132551, ¶ 87. Under fraud in fact, a party must prove that the transfer was made with actual intent to hinder, delay, or defraud the creditors. *Id.*; *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 22. A creditor can prove fraud in fact based on the existence of certain factors or " 'badges of fraud' " set forth in section 5(b) of the Uniform Fraudulent Transfer Act (UFTA) (740 ILCS 160/5(a)(1), (b) (West 2016)). *Bank of America*, 2015 IL App (1st) 132551, ¶ 88; see *Sharif*, 2014 IL App (1st) 133008, ¶ 22. The factors to consider are:

"(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 740 ILCS 160/5(b) (West 2016).

The factors are merely considerations and a court need not consider all 11 factors. *Bank of America*, 2015 IL App (1st) 132551, ¶ 89; *Sharif*, 2014 IL App (1st) 133008, ¶ 23. When the factors are present in sufficient numbers, they may give rise to an inference or presumption of fraud. *Bank of America*, 2015 IL App (1st) 132551, ¶ 89; *Sharif*, 2014 IL App (1st) 133008, ¶ 23. It is possible that the presence of only one factor could entitle a party to relief. *Bank of America*, 2015 IL App (1st) 132551, ¶ 89. Under the UFTA, " '[a] donor may make a conveyance with the most upright intentions, and yet, if the transfer hinders, delays, or defrauds his creditors, it may be set aside as fraudulent.' " *Sharif*, 2014 IL App (1st) 133008, ¶ 17 (quoting *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 193-94 (2010)).

¶ 35    Here, Holloway filed her charge of discrimination on February 7, 2011, and Helen became aware of the charge "in spring 2011." On January 1, 2012, Oakridge Center transferred its assets to Oakridge Healthcare, and Holloway's filing of her charge of discrimination put Oakridge Center on notice of a threatened lawsuit and the real possibility of judgment against Oakridge Center. Thus, Oakridge Center had the obligation not to dissipate assets. See *A.G. Cullen Construction Inc. v. Burnham Partners, LLC*, 2015 IL App (1st) 122538, ¶ 33 (holding that a transfer of assets by defendant after plaintiff filed a demand of arbitration put defendant "on notice of a threatened lawsuit and the real possibility of judgment against [the defendant]" and thus defendant "had the obligation not to dissipate the company's assets"); *Kennedy v. Four Boys Labor Services, Inc.*, 279 Ill. App. 3d 361, 369 (1996) (holding that a transfer of assets during the pendency of a lawsuit against a corporation supported the finding that the transfer of assets constituted a fraudulent conveyance).

¶ 36    Oakridge Center transferred to Oakridge Healthcare all of its (i) property, (ii) contracts, (iii) licenses, (iv) patient records, (v) patient trust funds, and (vi) supplies. Helen stated in her deposition that Oakridge Center transferred "beds, the license, three days worth of perishable foods, seven days of frozen [food], stock meds, medical supplies, maybe a couple reams of paper." The fifth "badge of fraud" is met because the transfer was for substantially all of Oakridge Center's assets. See *Apollo Real Estate Investment Fund*, 403 Ill. App. 3d at 194; 740 ILCS 160/5(b)(5) (West 2016).

¶ 37    In addition, because Oakridge Center never had the transferred assets appraised for value and that it never received any payment from Oakridge Healthcare for the assets, we hold that Oakridge Center did not receive reasonably equivalent consideration for the value of the transferred assets, and therefore hold that the eighth badge of fraud is met. See *Burnham*, 2015 IL App (1st) 122538, ¶ 35; 740 ILCS 160/5(b)(8) (West 2016).

¶ 38    Finally, with respect to the ninth "badge of fraud," we find that Helen stated in her deposition that in June 2011, Oakridge Center began to experience financial trouble and was no longer able to pay its rent to Oakridge Properties, which resulted in the company's termination of its lease with Oakridge Properties. We therefore hold that Helen's assertions establish that there is evidence that Oakridge Center was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

¶ 39    Based on the aforementioned findings, there is evidence to support an inference or presumption of fraud. See *Bank of America*, 2015 IL App (1st) 132551, ¶ 89; *Sharif*, 2014 IL App (1st) 133008, ¶ 23.

¶ 40                                     2. Fraud in Law

¶ 41        We note that a "fraud in law" transfer is set forth in sections 5(a)(2) and 6(a) of the UFTA. 740 ILCS 160/5(a)(2), 6(a) (West 2016); see also *Bank of America*, 2015 IL App (1st) 132551, ¶ 87; *Sharif*, 2014 IL App (1st) 133008, ¶ 18; *Burnham*, 2015 IL App (1st) 122538, ¶ 25. A fraud in law transfer occurs where the " 'transfer is made for no or inadequate consideration, [and] the fraud is presumed.' " *Bank of America*, 2015 IL App (1st) 132551, ¶ 87; *Sharif*, 2014 IL App (1st) 133008, ¶ 18; *Burnham*, 2015 IL App (1st) 122538, ¶ 25. Because we found that Oakridge Center did not receive reasonably equivalent value in exchange for the transferred assets, we hold that the transfer was made for no or inadequate consideration. Therefore, the transfer was made for the fraudulent purpose of avoiding Holloway's judgment because there was no consideration and evidence of the unreasonably small amount of assets. See 740 ILCS 160/5(a)(2)(A) (West 2016); *Bank of America*, 2015 IL App (1st) 132551, ¶ 87; *Sharif*, 2014 IL App (1st) 133008, ¶ 18; *Burnham*, 2015 IL App (1st) 122538, ¶¶ 25, 35.

¶ 42        Based on our findings that after Holloway filed her charge of discrimination and Oakridge Center became aware of the charge, Oakridge Center transferred to Oakridge Healthcare substantially all of its assets for no consideration, thereby possibly leaving Oakridge Center insolvent, we hold that the State presented sufficient evidence for a reasonable trier of fact to find that the asset transfer was for the fraudulent purpose of escaping Holloway's judgment. See 740 ILCS 160/6(a) (West 2016); *Bank of America*, 2015 IL App (1st) 132551, ¶ 87; *Sharif*, 2014 IL App (1st) 133008, ¶ 18; *Burnham*, 2015 IL App (1st) 122538, ¶¶ 25, 35.

¶ 43        The dissent contends that our consideration of the fraudulent purpose exception to achieve a just result only frames the question from Holloway's perspective, and it is "decidedly unfair" to Oakridge Healthcare. The dissent also states that it is unfair to Oakridge Healthcare because Oakridge Healthcare "negotiated a purchase of [Oakridge Center's] assets, which specifically excluded an assumption of the latter's liabilities." Therefore, it is unfair for us to impose Holloway's liability upon Oakridge Healthcare. The dissent goes on to state that because Oakridge Center was facing financial difficulties and "faced the choice of failing to make payments to its landlord or failing to meet its payroll," and choosing the latter option would have led to the immediate shutdown of Convalescent, Oakridge Center's "only viable choice was to conduct a 'fire sale' of its assets" and, therefore, there is no badge of fraud in this scenario. *Infra* ¶ 85. However, Oakridge Healthcare did not negotiate a purchase of Oakridge Center's assets. The record does not indicate that there were any negotiations between the parties, and more importantly, as we found, there was no purchase price because Oakridge Healthcare never paid any consideration for the assets. The dissent mistakenly believes that because Oakridge Center "retained the right to collect its accounts receivable, it cannot be said that the sale of its assets was without consideration." *Infra* ¶ 89. We firmly disagree with this reasoning because Oakridge Center cannot claim that the accounts receivables, which Oakridge Center already owned, were retained by Oakridge Center as consideration for transferring Oakridge Center's assets to Oakridge Healthcare.

¶ 44        With respect to the accounts receivable, it can be presumed that Helen and Oakridge Center retained them in order to satisfy past rent due as well as the early termination fee of the lease to Oakridge Properties. However the record does not indicate whether the past rent or the early termination fee were paid to Oakridge Properties. In her deposition, Helen could not answer whether the termination fee was paid because her husband "handled a lot of the financial stuff." Here, the record establishes the only outcome from the transfer of assets to Oakridge

Healthcare was that Oakridge Center managed to escape Holloway's judgment. Without further discovery to determine if Oakridge Healthcare used the money from the accounts receivables to satisfy past rent or the early termination fee, it is impossible to conclude that the transfer of the assets without consideration was not performed only to avoid Holloway's judgment. Accordingly, the court's granting of Oakridge Healthcare's motion for summary judgment was premature.

¶ 45    Furthermore, even if there were negotiations between the parties, employees such as Holloway are often never a consideration in such negotiations and are often left without a remedy. In this instance, Oakridge Center even admits that during its plans to cease operations of Convalescent and transfer the assets to Oakridge Healthcare, "no one had given any thought whatsoever to [Holloway's] *pro se* administrative charge." Instances such as this where corporations never even consider its employees when transferring their assets are part of the reason federal courts and some states have adopted successor liability in employment discrimination cases so they can protect discriminatee employees. Therefore, in the interest of fairness, we find that imposing liability on Oakridge Healthcare as a successor of Oakridge Center is a just result.

¶ 46    We commend the trial court's thoughtful consideration of the issues, but we conclude the trial court was not bound by any Illinois authority that required the grant of summary judgment. Nothing is this decision is meant to criticize the trial judge. The dissent mistakenly contends that our "approach is also patently unfair to the trial judge who was never asked to determine and thus never had the opportunity to analyze whether the fraudulent purpose exception to successor nonliability should apply." *Infra* ¶ 78. In the trial court's December 19, 2016, written order, the court found that the State did not establish that Oakridge Healthcare "was merely a continuation of Oakridge [Center], *or that the transaction was made for the fraudulent purpose of escaping liability.*" (Emphasis added.) Therefore, the trial judge did consider the fraudulent purpose exception, which also further supports our finding that this argument was raised in the trial court.

¶ 47    We note that the dissent contends that we offer no rationale "why a profitable venture would be liquidated to avoid a potential liability of indeterminate amount, which, as it turns out, was roughly the equivalent of one month's rent." *Infra* ¶ 87. First, we disagree with the description of this transfer of assets as a liquidation because, as we have repeatedly noted, Oakridge Center never received any consideration for its transfer of assets. Second, the good intentions of Oakridge Center for transferring its assets is not the issue because as we previously noted, under the UFTA, " '[a] donor may make a conveyance with the most upright intentions, and yet, if the transfer hinders, delays, or defrauds his creditors, it may be set aside as fraudulent.' " *Sharif*, 2014 IL App (1st) 133008, ¶ 17. We find the transfer hindered Holloway's recovery of the judgment she recovered against Oakridge Center for discriminating against her based on her age.

¶ 48    We also note that the dissent states that "Oakridge Healthcare did not discriminate against Holloway; Oakridge Center did. So the result reached here is nothing more than placing the financial burden of the predecessor's conduct on the successor corporation because the successor can afford to pay." *Infra* ¶ 79. The majority is well aware that Oakridge Healthcare did not discriminate against Holloway, but Oakridge Healthcare clearly acquired the assets of Oakridge Center for no consideration. As we discuss below, the successor who has taken over control of the business is generally in the best position to remedy such practices most

effectively.

¶ 49         D. Illinois Courts Shall Recognize Successor Liability for Violations
                        of the Illinois Human Rights Act

¶ 50    Next, the State urges this court to look to federal common law where successor liability is recognized as the default rule in employment discrimination cases. The State maintains that recognition of successor liability in employment discrimination cases aids victims such as Holloway to enforce judgments against employers involved in discriminatory practices who might otherwise escape liability. Oakridge Healthcare maintains that recognizing successor liability in the employment discrimination context departs from well-settled Illinois law, which is a violation of the doctrine of *stare decisis*. The dissent also contends that creating an entirely new exception to the general rule against corporate successor liability is beyond this court's power as an intermediate court of review. The dissent cites *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 28, which states that "[w]here the Supreme Court has declared the law on any point, *it alone can overrule and modify its previous opinion*, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases." (Emphasis in original and internal quotation marks omitted.) See *infra* ¶ 80. We are not overruling or modifying Illinois Supreme Court precedent.

¶ 51    As previously stated, Illinois recognizes four exceptions to the rule of corporate successor nonliability. *Vernon*, 179 Ill. 2d at 345. This general rule and its exceptions, however, only focus on transactions involving corporations and the transfer of their assets. See *id.* They do not consider discriminated employees such as Holloway, who have no control over these transactions and are left without a remedy when corporations transfer their assets. Our research establishes, and the dissent agrees, that our supreme court has not specifically addressed a successor corporation's liability for employment discrimination. Furthermore, neither Oakridge Healthcare nor the dissent cites a case in which our supreme court has addressed a successor corporation's liability in the employment discrimination context. Additionally, we are aware of *Blumenthal*. As we previously stated, we commend the trial judge for thoughtful care to the issues. However, because our supreme court has not specifically addressed a successor corporation's liability for employment discrimination, we are not overruling or modifying declared law. Therefore, we find that our holding in this case does not depart from Illinois law, but it is one of first impression.

¶ 52    While Illinois has not yet addressed a successor corporation's liability in the employment discrimination context, federal courts, by contrast, have considered the issue and have enunciated a standard for determining successor liability in cases involving employment discrimination. The Sixth Circuit first imposed liability on successor employers in *Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974). In *MacMillan*, the Equal Employment Opportunity Commission (EEOC) filed a complaint on behalf of an employee, alleging race and sex discrimination by her employer in violation of Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e *et seq.* (1964)). *MacMillan*, 503 F.2d at 1088. Sometime after the complaint was filed, a different corporation took over the operations of the employer. *Id.* The EEOC filed a complaint against the successor corporation and argued that it should be liable as the successor employer to remedy the discrimination suit. *Id.* at 1089.

¶ 53    In imposing successor liability in employment discrimination cases, the court looked to considerations that governed liability for successor employers under the National Labor Relations Act (Labor Act) (29 U.S.C. § 151 *et seq.* (1964)). See *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549 (1964); *National Labor Relations Board v. Burns International Security Services, Inc.*, 406 U.S. 272, 281-91 (1972); *Golden State Bottling Co. v. National Labor Relations Board*, 414 U.S. 168, 171-74 (1973). The court found that the considerations governing successor liability under the Labor Act were equally applicable to remedy unfair employment practices in violation of Title VII. *MacMillan*, 503 F.2d at 1090. The court reached this conclusion by noting that Title VII was molded largely after the Labor Act and that the relief provisions of Title VII were also derived from the Labor Act. *Id.* at 1091. Therefore, because both acts placed an emphasis on extending protection to and providing relief for victims of prohibited practices, the court found it sufficient to impose liability on a corporate successor for Title VII violations of the predecessor company. *Id.*

¶ 54    Under the Labor Act, the court implemented successor liability because it found that when there is a change in corporate ownership, employees ordinarily do not take part in negotiations between entities, and those negotiations are ordinarily not concerned with the well-being of the employees. *Id.* at 1089. Accordingly, the court found that "the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers" needed to be "balanced by some protection to the employees from a sudden change in the employment relationship." (Internal quotation marks omitted.) *Id.* The court noted imposing successor liability would achieve this balance because it found that the successor who has taken over control of the business is generally in the best position to remedy such unfair labor practices most effectively. *Id.* at 1090. The court also found that a successor's "potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices." (Internal quotation marks omitted.) *Id.*

¶ 55    In addition to the aforementioned considerations, the court imposed successor liability for employment discrimination stating that,

>        "[f]ailure to hold a successor employer liable for the discriminatory practices of its predecessor could emasculate the relief provisions of Title VII by leaving the discriminatee without a remedy or with an incomplete remedy. In the case where the predecessor company no longer had any assets, monetary relief would be precluded. Such a result could encourage evasion in the guise of corporate transfers of ownership. Similarly, where relief involved seniority, reinstatement or hiring, only a successor could provide it." *Id.* at 1091-92.

¶ 56    The court however cautioned that liability of successor employers is not automatic and must be determined on a case-by-case basis with the primary goal of providing the discriminatee with full relief. *Id.* at 1091. The court provided nine factors a court may consider in imposing liability on a successor corporation as follows: (1) whether the successor company had notice of the charge; (2) whether the predecessor was able to provide relief; (3) whether there has been a substantial continuity of business operations; (4) whether the new employer uses the same plant; (5) whether he uses the same or substantially the same work force; (6) whether he uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether he uses the same

machinery, equipment, and methods of production; and (9) whether he produces the same product. *Id.* at 1094. Some courts have condensed these factors by focusing on the first three factors and subsuming the remaining factors into the continuity of business operations factor.

¶ 57　　The Seventh Circuit, which also imposes successor liability in employment discrimination cases, further articulated the *MacMillan* factors in *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750-53 (7th Cir. 1985). The court first found that the first two factors—(1) whether the successor company had notice of the charge and (2) whether the predecessor was able to provide relief—are critical to the imposition of successor liability. *Id.* at 750. First, notice is required so that "the successor has some time to negotiate a change in the purchase agreement to reflect the potential liability of a lawsuit." *Id.* at 752. However, plaintiff does not have the burden of providing notice to the successor, rather, the burden is on the successor to find out from the predecessor all outstanding potential and actual liabilities. *Id.* Second, the ability of the predecessor to provide relief is also critical because it would be grossly unfair to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief. *Id.* at 750. With respect to the third factor, continuity in operations, which as noted subsumes the remaining factors, the court found "the amount of 'continuity' required between the predecessor and the successor will vary depending upon the number of employees adversely affected by the predecessor's action and the remedy requested by the injured employee(s)." *Id.* at 751. Less continuity is required where plaintiff is not seeking reinstatement, retroactive seniority, or placement on a preferential hiring list. However, greater continuity would be required if the plaintiff were seeking more than monetary relief. *Id.*

¶ 58　　Here, Oakridge Center's transfer of assets to Oakridge Healthcare meets the *MacMillan* factors. First, as previously noted, Oakridge Center had notice of Holloway's discrimination charge because Holloway filed it on February 7, 2011, and Helen became aware of the charge "in spring 2011," prior to the transfer on January 1, 2012. As for the second factor, Oakridge Center did not have the ability to provide Holloway relief because it admittedly began to experience financial trouble in June 2011 and was unable to pay its rent, establishing that it was insolvent or became insolvent shortly after the transfer was made, thus unable to provide Holloway relief. Finally, the third factor, which subsumes the remaining factors into the continuity of operations factor, is also met because Oakridge Healthcare continued to operate Convalescent as a nursing home, using the same workforce and at the same location. All of Convalescent's operations remained the same. Therefore, we find the transfer meets the *MacMillan* factors, and Holloway's judgment may be imposed on Oakridge Healthcare as Oakridge Center's successor.

¶ 59　　The dissent contends that "the federal common law exception in employment discrimination cases, based on 'mere continuation' of the predecessor, requires proof of elements different from and *** in conflict with those required to invoke the exception under Illinois law" because the federal law exception does not require proof of an identity of ownership as is required in Illinois. (Emphasis omitted.) *Infra* ¶ 81. As we noted, successor liability in employment discrimination is not only based on the mere continuation factor but, rather, on the first three of nine factors necessary to impose liability. *MacMillan*, 503 F.2d at 1094. Furthermore, the federal law exception purposely makes the mere continuation factor much more liberal by not requiring an identity of ownership because "the general common law rule of nonliability on the part of successors is too harsh to employees for application in the context of discrimination in employment, and that the traditional common law exceptions to

the nonliability rule insufficiently ease the harshness." *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1237 (7th Cir. 1986). Therefore, the federal common law exception is not in conflict with Illinois law, it is just more liberal to make it easier for employees who have been injured from discriminatory practices of corporations to be made whole.

¶ 60    Several states have followed the *MacMillan* standard for determining successor liability for employment discrimination in violation of the states' Human Rights Acts. See *First Judicial District Department of Correctional Services v. Iowa Civil Rights Comm'n*, 315 N.W.2d 83, 89 (Iowa 1982); *Stevens v. McLouth Steel Products Corp.*, 446 N.W.2d 95, 98-99 (Mich. 1989); *MTA Trading, Inc. v. Kirkland*, 922 N.Y.S.2d 488, 490-91 (App. Div. 2011). In *Kirkland*, a successor liability case where the underlying claim arose out of a violation of the New York State Human Rights Law, a New York appellate court held that using the *MacMillan* standard to determine successor corporation liability was proper because " '[t]he standards for recovery under the New York State Human Rights Law [citation] are the same as the federal standards under [Title VII].' [Citation.]" *Kirkland*, 922 N.Y.S.2d at 491.

¶ 61    Similarly in Illinois, the standards for recovery under the Illinois Act are the same as the federal standards under Title VII. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178 (1989); see also *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 138 (2009). Therefore, for similar reasons outlined by the Sixth Circuit in *MacMillan*, we hold that in an action where the underlying claim stems from a charge of employment discrimination in violation of the Act, Illinois courts may rely on the federal doctrine of successor corporate liability. See *MacMillan*, 503 F.2d at 1092.

¶ 62    We note that the dissent mischaracterizes our decision to follow federal law as being simply because "Illinois courts sometimes look to federal authorities regarding employment discrimination." *Infra* ¶ 84. We want to be clear that our decision to follow federal law successor liability in employment discrimination cases is not only because Illinois courts sometimes look to federal authorities regarding employment discrimination, but it is because in Illinois, the standards for recovery under the Act are the same as the federal standards under Title VII. *Zaderaka*, 131 Ill. 2d at 178; *Sangamon County Sheriff's Department*, 233 Ill. 2d at 138. Therefore, we find that using the *MacMillan* standard, specifically used to determine successor corporation liability in employment discrimination under Title VII, is proper to determine successor corporation liability in employment discrimination under the Act because the standards for recovery under the Illinois Act are the same as the federal standards under Title VII.

¶ 63    Finally, the dissent contends it is unfair to implement an additional exception to the general rule of successor nonliability only for victims of employment discrimination when Illinois has not made similar exceptions for "injured tort claimants, employees who have not been paid their earned wages, and vendors left without compensation for goods and services provided to the defunct entity." *Infra* ¶ 79; see *Villaverde v. IP Acquisition VIII, LLC*, 2015 IL App (1st) 143187; *Nguyen v. Johnson Machine & Press Corp.*, 104 Ill. App. 3d 1141, 1143 (1982); *Diguilio v. Goss International Corp.*, 389 Ill. App. 3d 1052 (2009). The claimants in all three cases failed to recover from the successor corporation, and thus the dissent believes that Holloway's hardship is not "qualitatively more compelling" to justify an exception than these claimants. *Infra* ¶ 79. These categories of claimants however are easily distinguishable from Holloway. In all three cases, the claimants sought to recover damages under the four traditional exceptions, but failed to satisfy the elements necessary to recover. In *Villaverde*, claimant

argued the fraudulent transfer exception, but the court found that there were not sufficient badges of fraud. *Villaverde*, 2015 IL App 143187, ¶ 48. Claimant also argued the continuation exception, but the court also found that claimant failed to satisfy this exception because there was no identity of ownership (*id.* ¶ 57), which is the most important factor to meet this exception, between the predecessor and successor corporation. Similarly in *Nguyen*, claimant failed to satisfy the continuation exception because there was no identity of ownership. *Nguyen*, 104 Ill. App. 3d at 1143. Finally in *Diguilio*, the court analyzed all four traditional exceptions and found that claimant failed to meet the elements required for any of the exceptions. *Diguilio*, 389 Ill. App. 3d at 1062-64. Here, contrary to these three claimants, we have found that there is evidence that the transfer may have been made for the fraudulent purpose of escaping Oakridge Center's obligation to Holloway. Furthermore, the State, on behalf of Holloway, specifically urged this court to adopt the federal doctrine of successor liability because Holloway's injury was caused by Oakridge Center's discriminatory practice. Therefore, we find that Holloway's case is different from the three claimants and because her injury was in the employment discrimination context, imposing an additional exception that furthers the eradication of discrimination in the work place is proper.

¶ 64                                              III. CONCLUSION

¶ 65        We find that forfeiture rules are an admonition on parties and not a limitation upon this court and that we can override considerations of forfeiture to achieve a just result. Therefore, in the interest of achieving a just result in an employment discrimination case, we have addressed the State's argument. We also find that the State presented evidence that (i) Holloway filed her charge of discrimination, (ii) after Oakridge Center became aware of the charge, Oakridge Center transferred substantially all of its assets to Oakridge Healthcare, (iii) Oakridge Center transferred its assets for no consideration, (iv) Oakridge Center transferred its assets without informing Holloway, and (v) the transfer resulted in the possible insolvency of Oakridge Center. We further find that the aforementioned evidence is sufficient to create a material issue of fact that the asset transfer was for the fraudulent purpose of escaping Holloway's judgment and, therefore, summary judgment was improperly granted. Finally, we hold that Illinois courts, including the circuit court in this case, shall rely on the federal doctrine of successor corporate liability in successor liability actions where the underlying claim stems from a charge of employment discrimination in violation of the Illinois Human Rights Act.

¶ 66        Reversed and remanded.

¶ 67        JUSTICE MASON, dissenting:

¶ 68        I respectfully dissent from the majority's decision to consider an argument deliberately waived by the State and to use that argument, never raised in the trial court, as the reason to reverse. Further, the majority's decision to adopt a federal standard of corporate successor liability in employment discrimination cases—whether or not warranted from a public policy standpoint—is nevertheless inconsistent with decades of controlling Illinois decisions. To the extent the majority determines that a departure is warranted from those authorities, that is a change that can only be effected by our supreme court. Because the trial court's decision was properly founded on well-settled Illinois authority, I would affirm.

¶ 69    The State has taken the position here that a reviewing court may affirm *or reverse* on any ground appearing in the record. In its opening brief, in support of that contention, the State cited two cases, neither of which stands for that proposition. The first, *Westfield Insurance Co. v. West Van Buren, LLC*, 2016 IL App (1st) 140862, ¶ 11, states: "[W]e may *affirm* on any basis in the record regardless of whether the trial court relied on that basis or its reasoning was correct." (Emphasis added.) The second, *Barney v. Unity Paving, Inc.*, 266 Ill. App. 3d 13, 18 (1994), does not state that a court may reverse on any ground appearing in the record. Rather, *Barney* stands for the proposition that on appeal from a summary judgment order, a reviewing court is not bound by the trial court's reasoning and may independently address issues briefed by the parties in the trial court, but not addressed in the court's ruling. *Id.* The State's reply brief does cite a case containing the broad statement "we may affirm or reverse on any basis found in the record" (*Huang v. Brenson*, 2014 IL App (1st) 123231, ¶ 16), but *Huang* did not reverse on a ground not argued by the appellant in the trial court. In fact, it affirmed the trial court's ruling. Further, as authority for the proposition that "we may affirm or reverse on any basis," *Huang* cited *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261 (2004), in which our supreme court stated "this court can *affirm* the appellate court on any basis present in the record." (Emphasis added.) As *Raintree Homes* did not approve reversing on grounds not raised in the trial court, *Huang* does not support the State's argument.

¶ 70    There is no general rule that allows litigants to try on one argument for size in the trial court, lose that argument, and raise new issues on appeal. In fact, the law is precisely the opposite. " '[T]he theory upon which a case is tried in the lower court cannot be changed on review[ ] and *** an issue not presented to or considered by the trial court cannot be raised for the first time on review.' " *Daniels v. Anderson*, 162 Ill. 2d 47, 58 (1994) (quoting *Kravis v. Smith Marine, Inc.*, 60 Ill. 2d 141, 147 (1975)); see also *Richardson v. Economy Fire & Casualty Co.*, 109 Ill. 2d 41, 47 (1985) ("[A]n appellant who fails to prevail on one theory in the court below is not at liberty to argue a different theory on appeal."); *Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill. 2d 507, 514-15 (1994) ("our responsibilities as a court of review do not extend to protecting a party from its own failed trial strategy"); *Trapani Construction Co. v. The Elliot Group, Inc.*, 2016 IL App (1st) 143734, ¶ 55 ("Generally, an unsuccessful party cannot raise a new theory of recovery for the first time on appeal. [Citation.] If the issue was not raised in the trial court, the party has not properly preserved the issue, which results in forfeiture of that issue on appeal." (Internal quotation marks omitted.)).

¶ 71    Illinois courts have long recognized that allowing a party to forgo litigating issues in the trial court only to raise them for the first time on appeal is antithetical to the fundamental concept that a reviewing court considers issues actually raised in the trial court, not those that could have been but were not raised. Permitting a change of theory on appeal not only prejudices the opposing party, but also "weaken[s] the adversarial process and our system of appellate jurisdiction." *Daniels*, 162 Ill. 2d at 59.

¶ 72    This is not a case in which a party inadvertently failed to raise an argument in the trial court. In its motion for summary judgment, Oakridge Healthcare, anticipating that the State might raise the issue, specifically addressed all four theories supporting exceptions to the general rule of corporate successor nonliability, including fraudulent purpose, and articulated why the evidence did not support application of any of those theories. In response, the State expressly limited its argument to the assertion that the only exception to the rule against nonliability for successor entities that applied was the "mere continuation" exception.

"THE COURT: I presume ... you're asking for the continuation exception, right?

MS. PRYOR [COUNSEL FOR THE STATE]: Correct."

Nowhere in the State's response to Healthcare's motion for summary judgment did it cite UFTA or any of the authorities it now relies on to support its new fraudulent purpose theory. And disavowing even the common law exception recognized in Illinois for successors that are merely a continuation of the seller, the focus of the State's arguments in the trial court was its contention, *based exclusively on federal law*, that "[i]n the context of employment discrimination, successor liability may be imposed even if it does not fall within any of the [four] exceptions" recognized in Illinois. The State went so far as to label Oakridge Healthcare's discussion of the four exceptions to successor nonliability under Illinois common law "irrelevant" because the State had raised "a genuine issue of material fact under [*sic*] whether the court should find Oakridge Healthcare center liable under *the federal common law doctrine of successor liability for employment discrimination cases*." (Emphasis added.) Counsel for the State reaffirmed at oral argument that (i) it never argued the fraudulent purpose exception in the trial court, (ii) it was not invoking on appeal the Illinois common law exception for successor entities that are a "mere continuation" of the seller, and (iii) its contention that Oakridge Healthcare was a "mere continuation" of Oakridge Center and should therefore be liable for Holloway's award is premised entirely on federal common law.

¶ 73 The phrase "badges of fraud" and Illinois authorities discussing the uniquely factual analysis necessary to support successor liability on the fraudulent purpose theory are absent from both the State's briefs filed in the trial court and the transcript of the argument on the motion for summary judgment. See *People v. Hughes*, 2015 IL 117242, ¶ 38 (noting that new factual theories on appeal "deprive the formerly prevailing party of the opportunity to present evidence on that point"). Accordingly, the State did not just forfeit this argument by failing to raise it; the State affirmatively waived this argument. See *id.* ¶ 37 (noting that although forfeiture and waiver have been used interchangeably, they are actually distinct doctrines, waiver being the "voluntary relinquishment of a known right," while forfeiture is the "failure to timely comply with procedural requirements" (internal quotation marks omitted)). Given Oakridge Healthcare's summary judgment motion, which specifically addressed and argued the inapplicability of the fraudulent purpose exception, the State's decision to refrain from responding to this argument amounts to a voluntary relinquishment of a known right.

¶ 74 And yet, despite the State's unequivocal disavowal of any argument in the trial court that the asset sale was effected for a fraudulent purpose, that is now the argument the State advances on appeal (having abandoned its argument that the mere continuation exception under Illinois common law applies) and that is the basis upon which my colleagues elect to reverse. I cannot agree that we should relieve the State of the consequences of its strategic decision not to litigate this issue in the trial court.

¶ 75 The majority rationalizes its decision to address this new argument on three grounds. First, the majority concludes that the State's complaint in the trial court stated a claim for fraudulent transfer. See *supra* ¶ 29 (the majority is quoting the State's allegations that Oakridge Healthcare was " 'aware of' " Holloway's claim and for that reason it is a " 'successor' " to Oakridge Center and responsible for its liabilities). While I do not agree with that analysis (see *Green v. Rogers*, 234 Ill. 2d 478, 494 (2009) (requiring fraud to be pled with "specificity, particularity and certainty" (internal quotation marks omitted)); *First Mercury Insurance Co. v. Ciolino*, 2018 IL App (1st) 171532, ¶ 39), that is beside the point. Even if the two paragraphs

contained in the State's complaint could be deemed sufficient to state a fraudulent transfer claim, it is well settled that a party opposing summary judgment may not rely on the allegations of its pleading to create a genuine issue of material fact. See *Land v. Board of Education of the City of Chicago*, 202 Ill. 2d 414, 432 (2002) (" 'If the party moving for summary judgment supplies facts that, if not contradicted, would warrant judgment in its favor as a matter of law, the opponent cannot rest on his pleadings to create a genuine issue of material fact.' " (quoting *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 470 (2001))). In its response to Oakridge Healthcare's motion for summary judgment, the State failed to even mention, much less argue, facts supporting a fraudulent purpose exception to the corporate successor nonliability doctrine under Illinois common law. This should be the end of the analysis.

¶ 76    Second, my colleagues reason that Oakridge Healthcare "raised" the issue in the trial court by addressing it in its summary judgment motion and so should not be surprised by this court's decision to consider it (*supra* ¶ 29). But, as noted, the State never responded to Oakridge Healthcare's analysis of the nonapplicability of the fraudulent purpose exception and so must be deemed to have conceded the merits of that argument. *Tebbens v. Levin & Conde*, 2018 IL App (1st) 170777, ¶ 25 (former client forfeited appellate review of his claim that *res judicata* did not bar his malpractice claim against law firm that represented him in an underlying divorce proceeding on ground that the elements of *res judicata* were not met, where client did not contest that elements were met before the trial court, but only argued that an exception to *res judicata* applied). Allowing the State to raise this argument for the first time on appeal encourages a party to (i) refrain from responding to an opponent's arguments in the trial court and later, on appeal, (ii) contend that the prevailing party "raised" the issue, so there is no unfairness in allowing the issue to be raised on appeal by and resolved in favor of the losing party. We should not condone or encourage such tactics.

¶ 77    Finally, the majority reasons that addressing arguments affirmatively waived by the State is necessary to achieve a "just result" (*supra* ¶ 30). While the majority quotes from our supreme court's decision in *Jackson* (" 'courts of review may sometimes override considerations of waiver or forfeiture in the interests of achieving a just result and maintaining a sound and uniform body of precedent' " (*supra* ¶ 30 (quoting *Jackson*, 2012 IL 111928, ¶ 33)), *Jackson* does not support a freewheeling invocation of a "just result" to overlook issues that have been affirmatively waived. In fact, when read in context, the supreme court's comments counsel against the majority's approach. In precluding a litigant from advocating a different result than she had argued in her petition for leave to appeal and her brief, our supreme court stated: "[W]hile our case law is permeated with the proposition that waiver and forfeiture are limitations on the parties and not on the court, that principle is not and should not be a catchall that confers upon reviewing courts unfettered authority to consider forfeited issues at will." *Jackson*, 2012 IL 111928, ¶ 33. And, as I discuss below, the majority's creation of a new exception to successor nonliability flatly contradicts "a sound and uniform body of precedent," precisely the opposite effect of the justification for considering waived issues in the first place.

¶ 78    The majority's conclusion that consideration of the fraudulent purpose issue is "just," frames the question from only one point of view. If we are defining a "just result" solely from the perspective of the employee attempting to collect an employment discrimination award, I understand the majority's point. But there are other fairness concerns implicated in the

analysis. Allowing the State to raise new issues on appeal is decidedly unfair to Oakridge Healthcare. First, Oakridge Healthcare negotiated a purchase of Oakridge Center's assets, which specifically excluded an assumption of the latter's liabilities. Because, as I discuss below, the evidence does not support a finding that the transfer was effected for a fraudulent purpose, the result reached by the majority frustrates the clearly expressed intent of the contracting parties. See *Kaleta v. Whittaker Corp.*, 221 Ill. App. 3d 705, 711 (1991). Second, even though the State failed to contest Oakridge Healthcare's fraudulent purpose arguments in the trial court, Oakridge Healthcare now has the issue resolved against it as the majority concludes that there are sufficient "badges of fraud" to preclude summary judgment. In a judicial system where we rely on advocates to control the issues presented for resolution at the trial level, such a result is fundamentally unfair. Finally, the majority's approach is also patently unfair to the trial judge, who was never asked to determine and thus never had the opportunity to analyze whether the fraudulent purpose exception to successor nonliability should apply.

¶ 79 My colleagues reason, pointing to the federal common law exception, that without the ability to recover from the successor entity, victims of employment discrimination will be left without redress, unable to collect their damage awards (*supra* ¶ 45). While this is undoubtedly true, the same can be said of injured tort claimants, employees who have not been paid their earned wages, and vendors left without compensation for goods and services provided to the defunct entity. But in all of the latter contexts, we have for decades consistently held that, absent proof of an applicable common law exception, the hardship caused by the general rule of corporate successor non-liability does not justify the imposition of liability on the purchaser of assets. See *Villaverde*, 2015 IL App (1st) 143187, ¶¶ 1, 48, 57 (rejecting employee's effort to collect $166,000 judgment for wages against successor LLC); *Diguilio v. Goss International Corp.*, 389 Ill. App. 3d 1052, 1063-64 (2009) (tort plaintiff who sustained severe personal injury from predecessor's defective product not entitled to pursue collection of judgment against successor, rejecting minority "product line" approach to successor liability); *Nguyen*, 104 Ill. App. 3d at 1149-51 (plaintiff whose hands were amputated by defective machine manufactured by predecessor entity not entitled to collect judgment against successor). All of these categories of claimants are left without a remedy against the successor entity, and I do not agree that Ms. Holloway's hardship is qualitatively more compelling so as to justify a heretofore unrecognized additional exception to the general rule. Oakridge Healthcare did not discriminate against Holloway; Oakridge Center did. So the result reached here is nothing more than placing the financial burden of the predecessor's conduct on the successor corporation because the successor can afford to pay.

¶ 80 The general rule of corporate successor nonliability, as formulated in Illinois, was articulated in *Vernon v. Schuster*, 179 Ill. 2d 338, 344-45 (1997), in which our supreme court recognized four—and only four—exceptions that warrant imposing successor liability on the purchasing entity. No supreme court decision in the past two decades has recognized additional exceptions in the name of a "just result" and, as noted, decisions from our court have uniformly declined to expand the categories of exceptions to the general rule of successor nonliability. Expressly, the majority modifies *Vernon* by creating a new exception to be applied in employment discrimination cases. See *supra* ¶ 49 ("Illinois Courts Shall Recognize Successor Liability for Violations of the Illinois Human Rights Act"). Fundamentally, the majority's decision to create an entirely new exception to the general rule against corporate

successor liability based on federal common law, when the only exceptions to the rule have been fixed for decades, is beyond our power as an intermediate court of review. See *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 28 ("Where the Supreme Court has declared the law on any point, *it alone can overrule and modify its previous opinion*, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases." (Emphasis in original and internal quotation marks omitted.)); *id.* ¶ 61 ("Under the doctrine of *stare decisis*, when this court has declared the law on any point, *it alone can overrule and modify its previous opinion ***.*" (Emphasis in original and internal quotation marks omitted.)); *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546, 551 (1983) ("It is fundamental that appellate courts are without authority to overrule the supreme court or to modify its decisions." (Internal quotation marks omitted.)).

¶ 81 And to complicate matters further, the federal common law exception in employment discrimination cases, based on "mere continuation" of the predecessor, requires proof of elements different from and, more importantly, *in conflict with* those required to invoke the exception under Illinois law. *Vernon* emphasized that, under Illinois law (as well as that of a majority of jurisdictions), the issue in a case involving the mere continuation exception is whether there is a continuation "of the *corporate entity of the seller*—not whether there is a continuation of the *seller's business operation*." (Emphases in original.) *Vernon*, 179 Ill. 2d at 346. Essential to the exception is proof of *identity of ownership* between the predecessor and successor entities. *Id.* at 347. Without identity of ownership, the fact that the successor carries on the business of the predecessor, keeps the predecessor's name, and hires the predecessor's managers and employees is not enough to impose liability under the mere continuation exception. See *Groves of Palatine Condominium Ass'n v. Walsh Construction Co.*, 2017 IL App (1st) 161036, ¶ 69 ("Plaintiff also points to the fact that the LLC operates out of the same locations and referred to the [predecessor] corporation's activities on its website as evidence that the LLC is merely the continuation of the corporation. However, as noted, our courts have 'consistently required identity of ownership before imposing successor liability under [the continuation exception].' " (Internal quotation marks omitted.) (quoting *Vernon*, 179 Ill. 2d at 347)); *Advocate Financial Group, LLC v. 5434 North Winthrop, LLC*, 2014 IL App (2d) 130998, ¶ 26 ("The test is not whether the seller's business operation continues in the purchaser, but whether the seller's corporate entity continues in the purchaser. [Citation.] The key consideration is whether there is identity of ownership, based on identity of officers, directors, and stockholders."). In contrast, under federal law, the elements of successor liability in employment discrimination cases are (1) whether the successor had notice of the pending lawsuit, (2) whether the predecessor would have been able to provide the relief sought in the lawsuit before the sale, (3) whether the predecessor is able to provide relief following the sale, (4) whether the successor is able to provide the relief sought in the lawsuit, and (5) whether there is a *continuity of operations and work force* between the predecessor and successor entities. *Equal Employment Opportunity Comm'n v. Northern Star Hospitality, Inc.*, 777 F.3d 898, 902 (7th Cir. 2015). Accordingly, while continuity of operations and workforce without continuity of ownership is insufficient, as a matter of law, in Illinois to defeat the general rule of successor nonliability, it can support the imposition of successor liability under federal common law. This is an irreconcilable conflict.

¶ 82 In adopting the federal common law rule, the majority flatly contradicts an unbroken line of cases from our court limiting the mere continuation exception as required under *Vernon*. Far

from "maintaining a sound and uniform body of precedent" (*Jackson*, 2012 IL 111928, ¶ 33), the majority's adoption of the federal common law standard throws well-settled law into flux and reignites arguments that have been consistently rejected by our court.

¶ 83    The uncertainty flowing from the majority's decision is easily illustrated. Assume, for example, that at the time a predecessor's assets are sold and the successor, a different entity, carries on the predecessor's operations, there are three complaints on file in state court: a personal injury action, a claim under the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2016)), and a discrimination lawsuit. Under the majority's rationale, all other things being equal, the discrimination claimant could potentially recover against the successor under the new federal common law exception adopted by the majority, while the other two plaintiffs, given the change in the corporate entity, could not recover under Illinois law. And if, as here, the transfer agreement contains an express nonassumption of liabilities by the successor, those words would be given effect in one context, but not the other.

¶ 84    I do not agree that the fact that Illinois courts sometimes look to federal authorities regarding employment discrimination supports a departure from settled Illinois law regarding the enforcement of judgments. Holloway's award was based on a violation of the Illinois Human Rights Act, not federal law. In the area of employment discrimination, federal law can provide guidance in the context of, for example, what quantum of proof is required to show discrimination on the basis of race or how, once a *prima facie* case of discrimination is established, the employer can rebut that showing. See *Sola v. Human Rights Comm'n*, 316 Ill. App. 3d 528 (2000); *Lalvani v. Human Rights Comm'n*, 324 Ill. App. 3d 774 (2001). But the liability of successor entities for judgments entered against their predecessors is not a subject on which we need to look to federal authority; it is a matter of Illinois law that is well established.

¶ 85    As a final matter, even if I agreed that we should reach the merits of the State's fraudulent purpose argument, I respectfully disagree with the majority's analysis. The State adduced no evidence that the financial difficulties faced by Oakridge Center in the fall of 2011 were contrived. The nursing home was $244,000 in arrears on its rent to Oakridge Properties due to the State's failure to timely process Medicaid applications for the facility's residents and Medicaid reimbursements.[1] At that point, Oakridge Center faced the choice of failing to make payments to its landlord or failing to meet its payroll. Choosing the latter option would, of course, have resulted in the immediate shutdown of the nursing home and the loss of its

---

[1]In this situation, Oakridge Center was not alone. See Tom Kacich, *Kacich: Letter to governor hints at nursing home peril*, The News-Gazette (Oct. 12, 2016) http://news-gazette.com/news/local/2016-10-12/kacich-letter-governor-hints-nursing-home-peril.html (last visited Feb. 13, 2019) [https://perma.cc/VN7J-6L64] (referring to county-owned nursing home "owed $1.5 million by the state in late Medicaid payments" and the delay in processing Medicaid applications " 'costing the home $180,000 a month' "); *Illinois Medicaid legislation too late for nursing home*, The Southern Illinoisan (Aug. 13, 2018), https://thesouthern.com/news/local/state-and-regional/illinois-medicaid-legislation-too-late-for-nursing-home/article_e3022b70-b3d1-533c-94d7-a55365861dda.html (last visited Feb. 13, 2019) [https://perma.cc/JK33-4TXG] (reporting closure of Macoupin County nursing home with a backlog of $2.3 million in Medicaid payments). As Oakridge Healthcare notes, there is no small irony in the fact that Oakridge Center was forced to sell its assets due to the State's delay in Medicaid payments while the State now attacks that same sale in an effort to impose liability on Oakridge Healthcare.

patients, so Oakridge Center's only viable choice was to conduct a "fire sale" of its assets, which it did. I find no "badge of fraud" in this scenario.

¶ 86     In discussing fraud in fact, the majority finds that Holloway's filing of her discrimination charge in February 2011 "put Oakridge Center on notice of a threatened lawsuit and the *real possibility of judgment* against [them]." (Emphasis added.) *Supra* ¶ 35. But the majority does not articulate how the mere filing of a charge of discrimination renders any transfer of assets effected thereafter *per se* suspect. Holloway did not obtain her judgment for more than 27 months following the transfer and so the causal relationship between Holloway's claim and the asset transfer is speculative, at best. Further, the authorities my colleagues cite are readily distinguishable. In both *Burnham* and *Kennedy*, the assets distributed by the corporate debtors were disbursed to insiders of the respective entities. *Burnham*, 2015 IL App (1st) 122538, ¶¶ 1, 8 (noting that after payment of a secured construction loan, the debtor LLC's remaining cash was distributed to another LLC controlled by an individual who also received, with his wife, substantial payments; essentially all of the LLC's cash ended up in the hands of the person who controlled the judgment debtor); *Kennedy*, 279 Ill. App. 3d at 364 (sole director of judgment debtor transferred the corporation's assets to her husband's probate estate; assets later transferred from the estate to the director, who then sold the assets to her four sons who, after forming a new corporation, continued to use the judgment debtor's trade name). Here, Oakridge Center's assets were transferred to Oakridge Healthcare, in which Helen has no interest.

¶ 87     It is not apparent (and the majority offers no rationale) why a profitable venture would be liquidated to avoid a potential liability of an indeterminate amount, which, as it turns out, was roughly the equivalent of one month's rent. This is particularly true, since Helen, the party the majority assumes orchestrated the fraud to avoid the discrimination claim, got nothing out of the deal. Although Oakridge Center retained the ability to collect its accounts receivable, any amounts collected were earmarked under the transaction documents to satisfy the $244,000 in back rent and the early termination fee of $210,000 owed by Oakridge Center (and guaranteed by Helen) to Oakridge Properties. The record does not disclose the amount of payments from the state that Oakridge Center expected to or did, in fact, receive.

¶ 88     And apropos of the State's ability to collect Holloway's judgment from Oakridge Center, nothing has prevented the State, following entry of the agreed judgment against Oakridge Center in February 2017, from pursuing a citation to discover assets. A citation would have permitted the State to recover Holloway's judgment from payments made (by the state, ironically) to Oakridge Center on its accounts receivable, and Holloway's judgment lien would be entitled to priority as neither Oakridge Center's liability for past due rent under the lease nor Helen's liability under the guarantee had been reduced to judgment. See 735 ILCS 5/2-1402(m) (West 2014) (lien of judgment creditor created by service of citation "binds nonexempt personal property, including money, choses in action, and effects of the judgment debtor"); *TM Ryan Co. v. 5350 South Shore, L.L.C.*, 361 Ill. App. 3d 352, 356 (2005) (lien that it is first in time has priority). Certainly, the judgment creditor's ability to collect the judgment from the transferor weighs heavily against a finding of fraud.

¶ 89     The majority draws a sinister inference from the fact that Helen, Oakridge Center's member/manager, knew Eli Atkins, one of the members of Oakridge Properties and a partner with Helen in another nursing home. The majority also finds it suspicious that Atkins formed Oakridge Healthcare to buy the nursing home's assets and did not conduct any valuation of

those assets before agreeing to take them. Finally, the majority characterizes the sale as "without consideration." Apart from the fact that the State did not advance any of these arguments in the trial court, I do not agree with these observations. It is undisputed that Helen has no interest in Oakridge Healthcare; the fact that she knew Atkins and had been (and might still be) in another nursing home venture with him is true, but irrelevant. As the member/manager of Oakridge Center's landlord, Atkins was undoubtedly familiar with the financial difficulties the nursing home was facing since it was not paying its rent and the only "assets" Oakridge Center possessed were the stream of income from its residents and its expectation of payments from the state. What a "valuation" of Oakridge Center's assets would have added to this scenario is unclear. The majority also overlooks that, as noted above, according to the transaction documents, Oakridge Center retained its accounts receivable, including past due sums from the state. Accordingly, because Oakridge Center retained the right to collect its accounts receivable, it cannot be said that the sale of its assets was without consideration. The fact that we cannot discern the amount of consideration from the record[2] is no reason to presume the transfer was fraudulent.

¶ 90    All of this highlights the intensely factual nature of the fraudulent purpose argument the State raises for the first time on appeal. Had the State believed more discovery was necessary before it could respond to Oakridge Healthcare's motion for summary judgment, it was incumbent on the State to file an affidavit outlining that discovery pursuant to Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013). The State's failure to do so precludes us from using inferences and assumptions to create issues of material fact where no such facts appear in the record.

¶ 91    I would affirm the judgment in favor of Oakridge Healthcare because (i) the State has waived its argument that the transfer from Oakridge Center to Oakridge Healthcare was fraudulent in law or in fact and (ii) there is no genuine issue of material fact that the long-established Illinois common law exceptions to the corporate successor nonliability do not apply and any expansion of those exceptions must be accomplished not by us, but by our supreme court.

---

[2]Of course the State could easily have ascertained the value of the accounts receivable retained by Oakridge Center as they were due and owing from a state agency. Even if it had raised this argument in the trial court, it was the State, not Oakridge Healthcare, who bore the burden of establishing the lack of consideration. Thus, the majority's finding that summary judgment was "premature" because this information was not provided by the State is misplaced.